UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPEN BOOK THEATRE COMPANY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BROWN PAPER TICKETS, LLC, et al.,<br><br>Defendants. | Case No.: 3:24-cv-0076-AGS-VET<br><br>**ORDER COMPELLING ARBITRATION (ECF 9), DENYING AS MOOT REMAINING MOTIONS, AND STAYING CASE** |

Defendants seek to compel arbitration of this putative class action based on the provisions of an online point-and-click agreement.

## BACKGROUND[1]

The legal battlefield here is the website of defendant Brown Paper Tickets, LLC, which handles ticket sales for event organizers. (*See* ECF 6, at 3.) To set up an "event" on that site, visitors are first presented with a checkbox and notice. (*See* ECF 9-2, at 3–4.) The notice affirms: "I have read and agree to the Brown Paper Tickets Event Organizer Terms of Usage." (*Id.* at 4.) Before proceeding, users must "affirmatively check" the box beside the notice. (*Id.* at 3.) The final eight words of the notice are displayed as a color-contrasted "blue hyperlink," which, if clicked, takes users to a page containing the promised Terms of Usage. (*Id.*; *see* ECF 9-4, at 2–7.) According to those terms, any dispute that "arises out of or relates to" the agreement and that cannot be resolved by mediation will be "resolved

---

[1] Open Book's evidentiary objections to Jeremy Campbell's declaration (*see* ECF 10-2) are overruled. "[O]n a motion to compel arbitration," a court "does not focus on the admissibility of the evidence's form, so long as the contents are capable of presentation in an admissible form at trial." *Lomeli v. Midland Funding, LLC*, No. 19-cv-01141-LHK, 2019 WL 4695279, at *7 (N.D. Cal. Sept. 26, 2019) (cleaned up). As to objections based on lack of foundation, Campbell established his personal knowledge in the introductory paragraphs of his declaration. (*See* ECF 9-2, at 2–3.) At any rate, the Court has not relied on Campbell's characterizations of the terms of the disputed agreement.

by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules." (ECF 9-4, at 6.)

Plaintiff Open Book Theatre Company created an account and listed three of its events on Brown Paper Tickets' website. (ECF 6, at 5.) Ticket sales for these performances generated $5,547 for Open Book. (*Id*.) Believing it was entitled to full payment "within 10 days of the event," and not having been paid within that time, Open Book filed a putative class action against Brown Paper Tickets and its parent company, codefendant Events.com, Inc. (*See generally* ECF 6; *see id*. at 3.)

Defendants now move to compel arbitration of all claims or, alternatively, to dismiss the complaint. (*See generally* ECF 9.)

## DISCUSSION

In opposing the defense's motion to compel arbitration, Open Book argues that: (1) no arbitration agreement was formed (*see* ECF 10, at 8–13); (2) even if one was formed, it was unconscionable (*see id.* at 13–19); and (3) regardless, Events.com, as a nonsignatory, cannot invoke the arbitration provision (*see id.* at 19–21). Before addressing these arguments, this Court must determine which jurisdiction's laws apply.

**A.    Choice of Law**

Open Book asserts that "California law" governs this dispute, as it is the forum state. (ECF 10, at 10.) Defendants, on the other hand, urge this Court to apply the law of Washington State, as required by the arbitration agreement's choice-of-law provision. (ECF 9-4, at 7 (stipulating that "any dispute will be governed by the laws and codes of the State of Washington").)

In a diversity case like this one, federal courts apply "the forum's choice of law rules"—here, California's. *See Insurance Co. of N. Am. v. Federal Express Corp.*, 189 F.3d 914, 919 (9th Cir. 1999). When a disputed contract has a choice-of-law clause, California courts determine "whether the chosen state has a substantial relationship to the parties or their transaction." *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015). If so, and if California would otherwise "be the state of the applicable law in the absence

of an effective choice of law by the parties," "the court then determines whether the relevant portion of the chosen state's law is contrary to a fundamental policy in California law." *Id.* If not, "the court applies the law of the forum selected in the contract"—here, Washington's. *Id.* at 1154.

Under this choice-of-law framework, California courts analyzing this agreement would apply Washington State law. First, defendant Brown Paper Tickets has a substantial relationship to the chosen forum of Washington, "where it is incorporated and has its headquarters." (ECF 9-1, at 18); *see Consul Ltd. v. Solide Enters.*, 802 F.2d 1143, 1147 (9th Cir. 1986) (finding a substantial relationship sufficient to "honor a choice-of-law provision" when "one of the parties resides in the chosen state"); *Simulados Software, Ltd. v. Photon Infotech Private*, 40 F. Supp. 3d 1191, 1197–98 (N.D. Cal. 2014) (collecting cases finding party had a "substantial relationship" to its state of incorporation or domicile). Second, the "laws of contract formation" in California and Washington "are materially the same." *Jackson v. Amazon.com*, 55 F. Supp. 3d 1132, 1138 (S.D. Cal. 2021), *aff'd*, 65 F.4th 1093 (9th Cir. 2023). So application of Washington law wouldn't violate any fundamental policy of California. Thus, Washington law applies.

**B.    Formation of Arbitration Agreement**

Turning to the merits, Open Book first protests that no arbitration agreement was ever formed. Under Washington law, "[m]utual assent is required for the formation of a valid contract," such as an agreement to arbitrate. *Yakima Cnty. Fire Prot. Dist. No. 12 v. City of Yakima*, 858 P.2d 245, 255 (Wash. 1993). "In the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (applying Washington law).

Online agreements "come primarily in two flavors: 'clickwrap' (or 'click-through') agreements . . . and 'browsewrap' agreements." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). "Clickwrap" agreements generally ensure better notice of their provisions, because the "website presents users with specified contractual terms on a

pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). "At the other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id*.

While Open Book relegates this agreement to the "browsewrap" category, that is plainly not so. The website does not seek to bind users by their passive browsing. As Open Book itself admits, to proceed through Brown Paper Tickets' website, a user "needs to 'check a box' that is next to the link" and agree to the terms of usage. (ECF 10, at 11.) This qualifies as a "modified" clickwrap agreement. That is, rather than presenting visitors the full contractual terms on screen, "users are notified of the existence of the website's terms of use" and advised that "by making some type of affirmative act, often by clicking a button," they are agreeing to them. *Moyer v. Chegg, Inc.*, No. 22-CV-09123-JSW, 2023 WL 4771181, at *4 (N.D. Cal. July 25, 2023).

Courts enforce modified clickwrap agreements, like the one here, when they satisfy two "rules to determine whether meaningful assent has been given": "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856.

### 1. *Reasonably Conspicuous Notice*

Because Open Book incorrectly analyzes this online agreement through a browsewrap lens, its arguments about conspicuousness mostly miss the mark. For example, it complains that "there is no specific call out to an arbitration agreement or that the intended user is waiving a right to a jury in the hyperlink," and that the "hyperlink to terms of use do[es] not satisfy the requirements to form a valid contract between the parties." (ECF 10, at 8–9.) In other words, Open Book presumes that the terms are not reasonably conspicuous, because the details are hidden until a user clicks on a hyperlink. But this is a standard feature of modified clickwrap agreements.

In the clickwrap context, courts evaluating reasonable conspicuousness must consider "the visual aspects of the notice"—like "font size, text placement, and overall screen design"—as well as whether the "context of the transaction" contemplated "some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024). Both these touchpoints cut in favor of proper notice here.

Take the visual components. The presence of a hyperlink "must be readily apparent," customarily by "use of a contrasting font color (typically blue)." *Berman*, 30 F.4th at 857; *cf. Marshall v. Hipcamp Inc.*, No. 3:23-CV-06156-TLF, 2024 WL 2325197, at *5 (W.D. Wash. May 22, 2024) (finding hyperlink insufficiently "obvious" when, among other failings, it was "not set forth in a different color to attract the reader's attention"). The hyperlink here was indeed set off in contrasting blue. (ECF 9-2, at 4.) In addition, the hyperlink was placed front and center, not buried in some misleading location. It appears next to the required "I agree" checkbox in the statement, "I have read and agree to the [Brown Paper Tickets Event Organizer Terms of Usage](). " (ECF 9-2, at 4.) And this checkbox notice and hyperlink are situated directly above the operative button "Add Event Producer Tools." (*See id*.) These convenient text placement and screen-design features distinguish this online agreement from invalid clickwrap agreements in which the "location of the hyperlink relative to the agreement" would "prevent a reasonable consumer from being on constructive notice." *See Weimin Chen v. Sierra Trading Post, Inc.*, No. 2:18-CV-1581-RAJ, 2019 WL 3564659, at *3 (W.D. Wash. Aug. 6, 2019); *see also McKee v. Audible, Inc.*, CV 17-1941-GW, 2017 WL 4685039, at *1–2 (C.D. Cal. July 17, 2017) (interpreting Washington law and finding insufficient notice when user "was not prompted or required to scroll past the Start Now box," below which the notice and hyperlink appeared).

Indeed, courts have approved less conspicuous notices when enforcing modified clickwrap agreements. *See, e.g., Grant v. T-Mobile USA, Inc.*, No. 2:23-CV-01946-MJP, 2024 WL 3510937, at *4 (W.D. Wash. July 23, 2024) (finding reasonably conspicuous a

hyperlink not presented in a contrasting color, when it was at least "underlined" and "labeled with '(PDF)'"); *Weimin Chen*, 2019 WL 3564659, at *3 (deeming reasonably conspicuous a notice separated from the "'Place my order' button" by "[s]everal lines of text in the same font and size," when the hyperlinked word "Term" in the notice was "both capitalized and underlined").

As for the "context of the transaction," the website's processes for setting up an account and creating an event convey an expected "continuing relationship" with customers like Open Book. *See Keebaugh*, 100 F.4th at 1019. Events are created for dates in the future, tickets are sold over time as the event date approaches, and multiple events may be set up. (*See* ECF 6, at 5 (noting that in July 2023 Open Book scheduled three August events)). The site offers tools to "[t]rack your ticket buyers and event traffic" and even "[c]hat with" those buyers. (ECF 9-2, at 4.) "There is no time limit imposed by [Brown Paper Tickets] on how long the user may access" the site's services—and apparently no limit on how much a user might earn. *See Keebaugh*, 100 F.4th at 1020. Reasonably prudent users would expect the hyperlinked terms to govern an ongoing and substantial business relationship.

In short, the design of the website and the transactional context provided reasonably conspicuous notice that the terms of usage to which the user would be bound—including arbitration terms—were set forth in the hyperlinked document.

### 2. *Unambiguously Manifested Assent*

Next, Open Book takes issue with the evidence of assent. It points out that users are not "required to open the link, read the terms[,] and assent to the terms that waive their rights," nor is there any evidence that Open Book in fact "clicked on the hyperlink." (ECF 10, at 9, 12.) Yet the issue is not whether Open Book clicked on the hyperlink, but whether it clicked on the checkbox for: "I have read and *agree to*" the hyperlinked terms of usage. (*See* ECF 9-2, at 4 (emphasis added).) Open Book must have done so, because users must check that box "before they are able to create an event." (*See* ECF 9-2, at 3.) And "checking a box or clicking on a button" may manifest the necessary assent. *Briggs v.*

6

*Service Corp. Int'l*, No. C22-1646-JLR, 2023 WL 2075958 (W.D. Wash. Feb. 17, 2023). A user's failure to click on the hyperlink or read the hyperlinked terms is irrelevant. If "a party has signed a contract without reading it, she cannot successfully argue that the contract is unenforceable as long as she was not deprived of the opportunity to read it." *Signavong v. Volt Mgmt. Corp.*, No. C07-515JLR, 2007 WL 1813845, at *3 (W.D. Wash. June 21, 2007).

In fact, courts regularly find unambiguously manifested assent due to two "defining features": "the forced confrontation with the terms" and "the forced decision to accept or reject them by clicking a button." *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1037 (W.D. Wash. 2018). So it is here. During Brown Paper Tickets' event-creation process, users cannot move on to create an event on the website until they first agree to the hyperlinked terms of usage (including the arbitration provisions) by affirmatively checking a box. This creates the necessary "forced confrontation with the terms" and "forced decision to accept or reject them." *See id*.

Thus, Open Book unambiguously manifested assent to the terms—including the arbitration provision—and the parties formed an agreement to arbitrate.

**C.    Unconscionability**

Even if an arbitration agreement was formed, Open Book contends that it "fails due to its procedural and substantive unconscionability." (ECF 10, at 14.) But this Court cannot reach those issues.

A federal court's review of any arbitration agreement is cabined by the Federal Arbitration Act. Under the Act, the parties to a contract involving interstate commerce, such as this one, "may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The Act also allows parties to further limit a federal court's authority with a delegation clause—a stipulation that "an arbitrator, rather than a court, will resolve threshold arbitrability questions," such as whether the "arbitration agreement applies to the

7

particular dispute." *Id*. Such a clause is effective so long as the parties delegate these threshold questions "by 'clear and unmistakable' evidence." *Id.* at 69.

The arbitration agreement here included a delegation clause, specifying that disputes "shall be finally resolved by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules." (*See* ECF 9-4, at 6.) Among other things, these AAA rules provide "that the 'arbitrator shall have the power to rule on his or her own jurisdiction[.]'" *Brennan*, 796 F.3d at 1130. As a result, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id.* Even unsophisticated parties may "clearly and unmistakably agree[] to arbitrate questions of arbitrability" when an "arbitration agreement incorporates AAA rules" because, "under Washington law, '[c]ourts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms.'" *G.G. v. Valve Corp.*, 799 F. App'x 557, 558 (9th Cir. 2020) (quoting *West Coast Stationary Eng'rs Welfare Fund v. City of Kennewick*, 694 P.2d 1101, 1104 (Wash. Ct. App. 1985)).

In the face of this clear and unmistakable delegation—and this Court's rejection of the argument that "an agreement to arbitrate was never formed"—there remains only one nondelegable issue that this Court may decide: "any challenge directed specifically to the enforceability of the delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). But Open Book does not mount this attack. Its unconscionability arguments are instead aimed at either the Terms of Usage agreement as a whole or else the entire arbitration provision (all of paragraph 20.2) in which the delegation clause sits. (*See generally* ECF 10, at 13–19; *see also* ECF 9-4, at 6 (paragraph 20.2).) Yet this Court may only hear arguments that are "specific to" and "contest the validity of the delegation provision in particular"; "unconscionability arguments [that] make no mention of it," but instead contend only that the "entire agreement" is unconscionable, are insufficient. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 74 (2010).

So, this case must be referred to arbitration, and "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *See Caremark*, 43 F.4th at 1030.

### D.    Events.com's Invocation of the Arbitration Provision

Finally, Open Book objects to the invocation of arbitration by Events.com because it is not "an intended third party beneficiary of the alleged agreement to arbitrate." (ECF 10, at 19.) This argument is entirely beside the point. The defense contends that Events.com should join the parties in arbitration under the doctrine of equitable estoppel, regardless of the intended beneficiaries. (*See* ECF 9-1, at 23–24.)

"The right to compel arbitration is generally limited to parties to the contract, but non-signatories may invoke arbitration under the [Federal Arbitration Act] if the relevant state contract law allows the litigant to enforce the agreement." *In re Pacific Fertility Ctr. Litig.*, 814 F. App'x 206, 208 (9th Cir. 2020) (cleaned up). Under Washington law, when a plaintiff sues both signatories and nonsignatories to an arbitration agreement, equitable estoppel may allow the nonsignatories to share the benefits of arbitration. Equitable estoppel "applies when the claims are intimately founded in and intertwined with the underlying agreement." *Norwood v. MultiCare Health Sys.*, 548 P.3d 978, 986 (Wash. Ct. App. 2024) (cleaned up); *cf. Patrick v. Ramsey*, No. C23-0630JLR, 2024 WL 3914866, at *5–6 (W.D. Wash. Aug. 21, 2024) (rejecting estoppel argument when claims were "based on [the nonsignatories'] extra-contractual conduct"). This rule prevents an arbitration-agreement signatory from strategically "avoid[ing] arbitration by bringing claims against nonsignatories." *David Terry Invs., LLC-PRC v. Headwaters Dev. Grp. LLC*, 463 P.3d 117, 123 (Wash. Ct. App. 2020).

Estoppel is proper here because the claims against Events.com "are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants." *See David Terry Invs.*, 463 P.3d at 124. Beyond the complaint's caption and attached exhibits, Events.com is only named individually in the document's opening paragraphs. (*See* ECF 6, at 3.) Otherwise, Brown Paper Tickets and its parent company

9

Events.com are charged collectively with each use of the term "Defendant or Defendants." (*Id*. at 4.) In fact, Open Book levels identical causes of action against defendants Brown Paper Tickets and Events.com, based on the same alleged failure to timely pay proceeds under the contract. (*See generally* ECF 6.) There are no unique allegations against Events.com. (*See generally id*.) It is hard to conceive of claims more "intertwined with the underlying agreement." *See Norwood*, 548 P.3d at 986.

Thus, Open Book is equitably estopped from avoiding arbitration as to its claims against Events.com and must face an arbitrator's decision on any remaining issues.

## CONCLUSION

Defendants' motion to compel arbitration is **GRANTED**, and all claims against both defendants, including the class claims, are referred to arbitration. This matter is **STAYED** pending resolution of arbitration. (*See* ECF 9-1, at 21, 36 (defense request for stay)); *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration," the Federal Arbitration Act "compels the court to stay the proceeding."). The alternative dismissal motion is **DENIED** as moot.

While arbitration is pending or proceeding, the parties must file a joint status report on December 1, 2024, and every three months thereafter (that is, March 1, 2025; June 1, 2025; etc.). Also, within 14 days of the arbitration action's conclusion, the parties must file a joint status report.

Dated:  September 18, 2024

Andrew G. Schopler
United States District Judge